ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                    )
                                               )
ECC International Constructors, LLC            )        ASBCA No. 59643
                                               )
Under Contract No. W912ER-10-C-0054            )

APPEARANCES FOR THE APPELLANT:        R. Dale Holmes, Esq.
                                      Michael H. Payne, Esq.
                                        Cohen Seglias Pallas Greenhall & Furman PC
                                        Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT:       Michael P. Goodman, Esq.
                                        Engineer Chief Trial Attorney
                                      Martin Chu, Esq.
                                      Katherine M. Smith, Esq.
                                      Engineer Trial Attorneys
                                      U.S. Army Engineer District, Middle East
                                      Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

In this appeal concerning a contract to design and construct a 20-building military compound in Afghanistan, appellant, ECC International, Inc. (ECCI), requests $3,512,057 for alleged government-directed contract changes, or constructive contract changes, regarding the design of the project's communications system. We issued an opinion in a companion appeal, *ECCI Int'l Constructors, LLC*, ASBCA No. 59586, 2025 WL 1357784 (Apr. 18, 2025), as well as other, related opinions, and assume the reader's familiarity with those opinions.[1]

FINDINGS OF FACT

The contract was awarded on September 29, 2010, in the amount of $29,186,338, and called for ECCI to design and construct a 70,000 square meter compound whose primary facilities included a communications building. ECCI was to complete the work within 548 days of receipt of the notice to proceed. After

---

[1] *E.g.*, *ECC Int'l Constructors, LLC*, ASBCA No. 59643, 21-1 BCA ¶ 37967 at 184,392; *rev'd and remanded*, *ECC Int'l Constructors, LLC v. Sec'y of Army*, 79 F.4th 1364 (Fed. Cir. 2023).

modifications, the revised contract completion date was March 13, 2013. *ECCI*, 2025 WL 1357784.

The contract is of the "design-build" type. Section 3.9 of the contract provides that ECCI's design submittals were required to be submitted for government approval at the "Preliminary (65%), Final (95%), and at the Cleared for Construction (100%) stage[s]." Section 3.9.2, "Final Design Review Submittal (95%)," provides that "[t]he review of this submittal is to insure that the design is in accordance with directions provided the Contractor during the design process," and that "[t]he only effort remaining between the FINAL DESIGN REVIEW SUBMITTTAL and the 'CLEARED FOR CONSTRUCTION' DESIGN REVIEW SUBMITTAL is the incorporation of the Government Review Comments." *Id.*

The government approved ECCI's 95% design on August 23, 2011, providing 56 comments on the communications design, one of the ten components of ECCI's proposed design. ECCI submitted its 100% design on November 19, 2011, incorporating those comments. Most of the project's buildings were cleared for construction in December 2011. However, on December 16, 2011, the government disapproved the 100% design, providing 226 new comments on the communications design. The government would require ECCI to submit the 100% communications design for review no fewer than three more times before approving it. *Id.*

DECISION

Pointing principally to the communications of James R. ("Chip") Hopkins, Jr., a government employee who authored "the Section 10 portion" of the contract specifications related to the project's communications system, and who is referred to by the parties as a "design reviewer,"[2] ECCI brings change claims regarding (1) additional and changed outlets, (2) dedicated electrical systems, (3) additional government design review requirements, (4) server cabinets and wall-mounted racks, (5) "UL Listed communications materials," (6) "LeGrand raised floor boxes," (7) "non-metallic, UL Listed, surface-mounted raceway," (8) UL Listed flexible conduits and spare conduit, (9) "trunk and splice," (10) spare capacity and wire managers for relay racks, (11) an uninterruptible power supply (UPS), (12) UL Listed HVAC equipment with R-410 refrigerant, (13) additional Local Operator Consols (LOCs), (14) a resized vehicle maintenance facility, and (15) "144 FOCU Units."[3]

---

[2] Tr. 8/5-6; app. br. at 5 ¶ 24; gov't br. at 56.

[3] App. br. at 65-92. This list generally tracks the order and nomenclature of the items that ECCI addresses at pages 65-92 of its initial post-hearing brief. There are three exceptions: (1) item number 14 at page 92 of that brief references the relocation of a spoils pile, for which, in *ECCI Int'l Constructors, LLC*, ASBCA No. 59643, 24-1 BCA ¶ 38,490 at 187,085, we awarded $29,680, upon the

ECCI charges that "[d]espite numerous complaints from ECCI that [Mr.] Hopkins was directing changes to the contract," the administrative contracting officer (ACO) and the contracting officer's representative (COR) "failed to investigate the propriety of [Mr.] Hopkins' comments, instead directing ECCI to follow them,"[4] and that the ACO and the COR "had virtually no knowledge or experience with communications systems, continually deferred to [Mr.] Hopkins, and directed ECCI to comply with his comments without any due diligence verification."[5]

The contract vests the authority to change the contract in the contracting officer, incorporating the full text of Federal Acquisition Regulation (FAR) 52.243-4, CHANGES (JUN 2007), which provides:

> (a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract . . .
>
> . . . .
>
> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order . . . .[6]

Pursuant to FAR 52.243-4, "a contractor is entitled to an equitable adjustment only for those changes ordered or directed by the [c]ontracting [o]fficer." *Edge Constr. Co. v. United States*, 95 Fed. Cl. 407, 420 (2010). Even the contracting officer's authorized

---

agreement of the parties; (2) we address, at item number 4, "server cabinets and wall-mounted racks" (also referred to as "relay racks") for which ECCI requests (at page 98 of its brief) $170,462, but does not include in the list of change claim items that appears on pages 91-92 of its brief; and (3) additionally, we address, at item number 16, below, what the government at page 119 of its initial brief says is a claim that ECCI has abandoned, concerning ladder rack and overhead cable tray. Finally, in *ECCI Int'l Constructors, LLC*, 24-1 BCA ¶ 38,490 at 187,085, we awarded, upon the agreement of the parties, $24,904 for work on a military working dog kennel, which ECCI addresses on pages 88-89 of its 2020 initial post-hearing brief.

[4] App. br. at 11 ¶ 58.
[5] *Id.* at 17 ¶ 69.
[6] R4, tab 5 at 92-93.

representative cannot change the contract: the contract incorporated Defense Federal Acquisition Regulation Supplement (DFARS) clause 252.201-7000, CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991) by full text which provides, at subsection b:

> The COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract.[7]

As a result, only the contracting officer had authority to modify ECCI's contract. *See BGT Holdings LLC v. United States*, 984 F.3d 1003, 1012-13 (Fed. Cir. 2020); *Conquistador Dorado Joint Venture*, ASBCA No. 60042 *et al.*, 24-1 BCA ¶ 38,486 at 187,070-71; *Derian, Inc.*, ASBCA No. 62957, 23-1 BCA ¶ 38,425 at 186,757.

*1. Additional Outlets and Changed Outlets*

ECCI requests $1,333,015.53, alleging that:

> ECCI was required to install additional communications outlets that increased the amount of cables project-wide by approximately 62.4%, as well as similarly increasing the quantity of keystone modules / connectors and terminations, the number or size of raceways, the total length of Category 6 cables, and the quantity of patch panels. These increases created constrained workspace and clearance issues that impacted labor productivity and ECCI's costs.[8]

ECCI further alleges that:

> Based on [the government's] directive to install additional communications outlets and Sage's calculation of the delay resulting from that directive, ECCI met its burden of showing 53 days of compensable delay.[9]

More specifically, ECCI alleges that:

> ECCI was forced to install additional communications outlets above those required by the Contract, based on the

---

[7] *Id.* at 107.
[8] App. br. at 65-66 ¶ 164-65.
[9] *Id.* at 60.

4

following improper directives to: 1) round up when calculating wall outlets in offices; 2) install the configuration of outlets for office space, in all non-office space; and 3) install additional outlets in the "raised floors" in the TOC.[10]

With respect to: "rounding up," in his opening statement, ECCI's counsel previewed ECCI's position that the contracting officer directed ECCI to "round up":

> But the roundup issue, which is exactly how many outlets you need to have for your design in the building, [the contracting officer] didn't actually tell us that on December 13, 2011. He said there's something wrong with your density, but he doesn't specify what it is. *Then he comes back in June 2012 on the 18th and his specific comment says you must round up on all these offices then.*[11]

In addition, ECCI alleges that:

> [Mr.] Hopkins directed outlet quantity calculations for wall outlets by dividing the area by 4.5 SM, and rounding up to a whole number. ECCI was forced to install 2 wall outlet groups in office spaces between 0 and 4.5 SM, 3 wall outlets groups in office spaces between 4.5 SM and 9.0 SM, etc.[12]

ECCI also says that Mr. Hopkins "changed the configuration of wall outlets in non-office spaces,"[13] and that the contracting officer "confirmed this directive by directing ECCI to follow all of [Mr.] Hopkins' comments."[14] Finally, ECCI says that Mr. Hopkins directed that ECCI "install additional outlets in the 'raised floors' in the TOC,"[15] and the contracting officer "confirmed this directive by directing ECCI to follow all of [Mr.] Hopkins' comments."[16]

---

[10] *Id.* at 20 ¶ 91.
[11] Tr. 1/72 (emphasis added).
[12] App. br. at 20-21 ¶ 93.
[13] App. br. at 21 ¶ 98.
[14] *Id.* at 21 ¶¶ 98-99.
[15] *Id.* at 20 ¶ 91.
[16] *Id.* at 21 ¶¶ 98-99.

In support of these allegations, ECCI cites Exhibit 1, the 44-page, 256-paragraph, single-spaced, sworn statement of Scott A. Hayward, an ECCI Senior Program Manager,[17] who states that "ECCI requested and received Contracting Officer direction on several issues in February 2012," citing two documents:[18] (1) a February 12, 2012 letter from ECCI to the government requesting contracting officer direction,[19] and (2) an overall site plan drawing.[20] Neither document is evidence of contracting officer direction. Mr. Hayward also cites design comment 4329574, which appears not to exist, at least in the document of record to which Mr. Hayward points.[21]

In general, ECCI alleges that:

> [Mr.] Hopkins was improperly given unchecked authority to act on behalf of [the government] on the 100% communications design. Despite numerous complaints from ECCI that Hopkins was directing changes to the contract, [the government's] ACO and COR repeatedly failed to investigate the propriety of Hopkins' comments, *instead directing ECCI to follow them.* [22]

ECCI fails to identify either by quotation or otherwise, in any of the documents it cites, any direction by the contracting officer regarding outlets, much less does ECCI demonstrate that such direction constitutes a change to the contract. ECCI cites a lengthy string of documentary evidence that it does not explain or even quote; much less does ECCI demonstrate through those documents that the government gave Mr. Hopkins "unchecked authority to act on behalf of" the government with respect to the 100% communications design.[23] For example, ECCI cites a statement by Mr. Hopkins that "[a]ll room outlet calculations need to be reviewed to ensure the number meets the requirements of the 01 80,"[24] but Mr. Hopkins was not a contracting officer, and that statement merely indicates that the contract be followed. Elsewhere, ECCI refers to "the Contracting Officer's and [Mr.] Hopkins' directives," "including the direction to round up outlet quantity calculations," again citing, without

---

[17] *Id.* at 65-66 ¶ 164; ex. 1 at 1.

[18] Ex. 1 at 10 ¶ 43.

[19] R4, tab 217.

[20] R4, tab 200.

[21] Ex. 1 at 18 ¶ 81 (citing R4, tab 755).

[22] App. br. at 11 ¶ 58 (emphasis added).

[23] *Id.*

[24] R4, tab 755 at 36, comment 4329398.

explanation or quotation, several documents of record.[25] ECCI also cites Mr. Hopkins' statement that:

> The Contractor needs to go back and calculate outlet quantities in the offices. The Contracting officer has directed the Contractor to follow the specifications on outlet density and this building has a density of one standard outlet configuration of each system for every 4.5 meters of office space. There are no fractional outlets, so there are offices that require one more standard outlets configuration.[26]

That statement, however, is, again, not one of the contracting officer, nor does it expressly or explicitly attribute to the contracting officer the idea that the parties refer to a "rounding up"; that is, that "[t]here are no fractional outlets, so there are offices that require more than one standard outlet." Much less does that statement identify where the contracting officer directed that ECCI "round up."

Regarding whether the contract actually requires "rounding up," section 10.16 of the contract, "Outlets Densities," provides:

> One secure network outlet, one above secret network outlet and one NIPR net outlet per every 4.5 square meters of office space.[27]

The plain language of section 10.16 does not provide for any "rounding up" in the event that dividing an office's square footage by 4.5 square meters results in other than a whole number. Rather, as we have already, previously illustrated in *ECC Int'l Constructors, LLC*, ASBCA No. 59138, 19-1 BCA ¶ 37,281 at 181,387:

> [I]f an office measures 4.5 square meters, the office shall have one secure network outlet, one above secret network, and one NIPR net outlet; if an office measures more than 4.5 square meters but fewer than 9 square meters, one of each; if 9 square meters, two of each; and so on.

Regarding outlet configuration, ECCI also says that Mr. Hopkins "directed that wall outlets in any non-office location be configured the same as the office wall outlets," and that the contracting officer "confirmed this directive by directing ECCI to

---

[25] App. br. at 12-13 ¶ 61(4).
[26] R4, tab 883 at 8-9, comment 4676194.
[27] R4, tab 5 at 462, subsections (a), (d), (g)-(i); *see also* subsection (c).

follow all of Hopkins' comments."[28]  In support of that allegation, ECCI cites a February 21, 2012 letter from Contracting Officer Michael A. Duncan, in which Mr. Duncan responds to ECCI's February 12, 2012 letter, citing several documents.[29] In that February 21, 2012 letter, the contents of which ECCI does not discuss in any detail, Mr. Duncan addresses many items, including outlets; but ECCI does not point to where, if at all, in that letter, Mr. Duncan directed that ECCI (referring now to all three of ECCI's allegations in this part of its appeal) (1) round up when calculating wall outlets if offices, (2) install the configuration of outlets for office space, or (3) additional outlets in "raised floors."[30]  Nor do we find such direction upon our own examination of that document.

In support of its allegation that the government directed ECCI to follow all of Mr. Hopkins' comments, ECCI cites the December 6, 2012 letter of ACO John Long.[31] On December 5, 2012, ECCI wrote to ACO Long regarding seven comments that ECCI had received from government reviewers of its communications systems designs, "to request [c]ontracting [o]fficer direction to resolve the issues associated with the reviewer's direction to perform work" that ECCI stated "was not in our contract."[32]  Of the items at issue here, those comments concerned only (1) outside plant configuration (OSP); (2) 25% spare capacity; and (3) wire managers for relay racks.[33]  In his December 6, 2012 letter, ACO Long wrote to ECCI in response to its December 5, 2012 letter:

> *It should be clearly noted that the Government does not consider any of the design comments received by ECCI to be outside the current contract requirements nor are they issues that require Contracting Officer direction.* However [sic] should ECCI continue to believe that any of the current comments or future comments is not within the current contract requirements *it is contractually imperative that ECCI* provide timely notice to the Government *while moving forward with the comments provided.*[34]

---

[28] App. br. at 21 ¶¶ 98-99 (citing R4, tab 211 (a letter from ECCI); tab 220 (February 21, 2012 letter from the contracting officer), tab 345 (letter from an authorized COR), tab 367 (a letter from a COR), 384 (a letter from an ACO)).

[29] *Id.* at 21 ¶ 99 (citing R4, tab 220).

[30] R4, tab 220.

[31] App. br. at 21 ¶ 99 (citing R4, tab 384).

[32] R4, tab 382 at 1.

[33] *Id.* at 1, 3 (comments 1 and 6).

[34] *Id.* at 1 (emphasis added).

We interpret Mr. Long's statement as contracting officer direction, express or implied, that ECCI implement the seven design reviewer comments addressed in ECCI's December 5, 2012 letter, including because that statement was made in response to ECCI's explicit request for "contracting officer direction to resolve the issues associated with the reviewer's direction to perform work." The contracting officer's advice to ECCI that if it "continu[ed] to believe that any of the current comments or future comments is not within the current contract requirements," "it is contractually imperative that ECCI provide timely notice to the Government while moving forward with the comments provided" does not change our view: that statement expressly directs ECCI to move forward with the reviewer's comments.[35] However, none of the seven comments in ECCI's December 5, 2012 letter concerns the additional outlets and changed configurations that are the subject of this part of ECCI's appeal. Nor will the Board scour the record for evidence supporting ECCI's argument. *See ESCgov, Inc.*, ASBCA No. 58852, 17-1 BCA ¶ 36,772 at 179,189; *Highland al Hujaz*, ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,169-70. ECCI fails to demonstrate that the government changed the contract regarding "additional outlets and changed configurations," and we accordingly deny ECCI's request for additional compensation for this item.

*2. Dedicated Electrical Panels in Telecommunications Rooms*

ECCI seeks $28,638.85 for what it says was a government change to the contract requiring it to install dedicated electrical panels in communications rooms, and alludes to "a directive to install dedicated electrical panels in communications rooms."[36] ECCI also alleges that "[o]n June 12, 2013, after much of the electrical work was installed, [the government] requested dedicated electrical panels in the communications rooms."[37] Finally, ECCI alleges that "[o]n September 10 and 11, 2013, [the government] directed ECCI to install dedicated electrical panels in the communications rooms of the TOC and JOC only."[38]

On June 12, 2013, ECCI wrote to the government that "ECCI was recently directed to install dedicated electrical distribution panels for each Communications

---

[35] *Id.*

[36] App. br. at 26 ¶ 127, 66; *see* app. br. at 20 ¶ 90 (citing app supp. R4, tabs 255, 1185, 1189, 1190; ex. 1 at 38 ¶¶ 217, 220; ex. 19 at 23 ¶ 1; tr. 5/66-66, 76-77, 99, 153-54).

[37] *Id.* at 23 ¶ 111 (citing R4, tab 538; ex. 1 at 38 ¶ 215; ex. 19 at 21 ¶ 3).

[38] *Id.* at 24 ¶ 113 (citing R4, tab 5 at 461; app. supp. R4, tabs 254, 255).

Room on the project."[39]  On September 11, 2013, ACO Peter Gauer, referencing that June 12, 2013 letter, stated that:

> The Government did not respond to this letter because as stated above the Government's position is that this is a contract requirement per the original request for proposals solicitation so there is no need by the Administrative Contracting Officer or the Contracting Officer to direct the Contractor to do what has been interpreted by the Government to be in your contract.[40]

We need not decide whether Mr. Gauer's statement constitutes contracting officer direction, express or implied, that ECCI install dedicated electrical distribution panels.  As the government points out, the contract provides that certain publications listed in the contract "form a part of this specification"; that is, paragraph 10.1.1 of the contract, "to the extent referenced."[41]  The publication "I3A (2010) Technical Criteria for Installation Information Infrastructure Architecture," is one of those publications referenced, and the contract incorporates the I3A in its entirety.[42]  The I3A, ¶ 2.2.15, provides: "[p]rovide a dedicated electrical panel for each TR," with "TR" meaning "telecommunications room."[43]  ECCI does not address the I3A, ¶ 2.2.15.  Because the contract, by referencing the I3A, requires dedicated electrical panels in each telecommunications room, we deny ECCI's claim for $28,638.85 for dedicated electrical panels for communications rooms.

Alternatively, we determine that in 2013, ECCI conceded away its dedicated electrical panels claim.  In its 2020 reply brief, ECCI challenges the government's contention that ECCI had previously conceded whether the contract requires dedicated electrical panels in telecommunications rooms.[44]  Indeed, in responding to a 2016 government summary judgment motion regarding whether the contract requires dedicated electrical panels, ECCI stated that it "concedes this issue and will revise its claim accordingly at the quantum stage."[45]  ECCI attempts to walk away from that concession, citing *Clearmeadow Inv. v. United States*, 87 Fed. Cl. 509, 529 (2000), for the point that "a party may concede a fact for purposes of its own summary judgment motion and yet reserve the right to litigate that fact should its motion be overruled,"

---

[39] R4, tab 538.

[40] App. supp. R4, tab 255 at 1.

[41] Gov't br. at 22; R4, tab 5 at 450-51 § 10.1.1.

[42] R4, tab 5 at 450.  The transcript of the hearing references the I3A as "the IAAA."  *E.g.*, tr. 8/198.

[43] R4, tab 826 at 11 § 2.2, 27 § 2.5.15.

[44] App. reply at 96; gov't br. at 107.

[45] ASBCA No. 59138 *et al.* app. Oct. 3, 2016 resp. at 100.

and noting that the Board did not rule upon that part of the government's motion.[46] However, ECCI did more than make a strategic concession for purposes of advancing a summary judgment motion, *cf. Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443, 445 n.2 (2011) (describing defendant's concession in support of ultimately unsuccessful pursuit of summary judgment as "behind us"): ECCI abandoned the entirety of its dedicated electrical panels claim in response to the government's motion for summary judgment. Having done so, we determine in the alternative that ECCI abandoned its claims for compensation related to dedicated electrical panels for telecommunications rooms.

### 3. Alleged Additional Design Review Costs

In a claim that is companion to a delay claim that we decided in *ECCI*, 2025 WL 1357784, ECCI requests $246,101, consisting of $24,022 for conference calls, $146,397 for additional design review comments, and $41,857 for design project management, allegedly incurred by its designer, Atkins Global, for what ECCI says were "over 60 design conferences, in person and telephonic, caused by [Mr.] Hopkins' improper design review," including the government's "improper issuance of new design comments on the five 100% design submittals."[47] In *ECCI*, 2025 WL 1357784 (footnotes omitted), we held that:

> In response to ECCI's 95% design submission, the government made 56 comments, on the communications design. When ECCI responded with a 100% communications design that incorporated those 56 comments, ECCI was entitled to the approval of that design, and clearance for construction. Instead, the government responded with 226 new comments, triggering a delay period that we conclude is attributable to the government.

We concluded that ECCI was "entitled to the remission of 119 days of liquidated damages for excusable delay." *Id.* Applying the reasoning behind that conclusion, we determine that ECCI is entitled to recover the cost of responding to the government's review of the 100% communications design.

The three amounts that ECCI seeks for this item correspond to three unrounded figures—$24,021.54, $146,396.70, and $41,857.45, totaling $212,275.69—that appear in a spreadsheet[48] that was prepared by the project manager for Atkins Global,

---

[46] App. reply at 96.
[47] App. br. at 66 ¶ 169, 67 ¶ 171-72.
[48] App. supp. R4, tab 329 at 4.

Ms. Terry Suehr, whom we credit, and who testified that those unrounded figures represent the costs of the additional design services that Atkins Global incurred responding to the government's comments upon ECCI's 100% communications design.[49] To that ECCI adds markups for its total request of $246,101.[50] The government apparently challenges Ms. Suehr's work, and by extension ECCI's damages calculation, as "nothing more than speculation,"[51] pointing to Ms. Suehr's explanation to ECCI that:

> For JanCom's effort, I was not able to receive a breakdown, but I did have a total. I guessed that the best way to divide their effort across tasks, but you may want to revise this.[52]

"The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (quoting *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969); *see also Missouri Dep't of Soc. Servs.*, ASBCA No. 61121, 19-1 BCA ¶ 37,240 at 181,278. Ms. Suehr's inclusion of $5,632.94 for "JanCom" into her $212,275.69 calculation[53] is supported by the sworn statement of John Jankowski (whom the government accepts is JanCom's president[54]), who declared under oath that the breakdown of JanCom costs reflected in Ms. Suehr's spreadsheet "generally appears to be a reasonable estimate of the relative effort required for each of the identified issues."[55] We credit that $5,632.94. ECCI claims a 5.4% G&A rate and a 10% profit rate, which it says are approved by DCAA (Defense Contract Audit Agency), which are reflected in an ECCI spreadsheet,[56] and which the government does not challenge. We credit those rates, and award the requested $246,101 for this item.

---

[49] *See* app. br. at 5 ¶¶ 27-28; ex. 11 at 7-12; app. supp. R4, tab 329 at 1, 4; tr. 4/10-13.

[50] App. br. at 67 ¶ 172.

[51] *See* gov't br. at 72-73.

[52] *Id.* at 72 ¶ 92.

[53] App. supp. R4, tab 329 at 4.

[54] Gov't br. at 73 ¶ 93.

[55] Ex. 15 at 4.

[56] App. br. at 66 ¶ 165 & n.12; app. supp. R4, tab 321 at "Added Work Direct Cost Summary.

*4. Server Cabinets, Relay Racks, and Modification No. 13*

In an example of the problematic briefing provided by both parties in this appeal, the government says that ECCI was "completely compensated" for server cabinets and relay racks by Modification No. 13 (which ACO Long issued unilaterally on January 13, 2013), *and* that ECCI is entitled "to additional costs incurred in excess of the $300,000 provided in Modification No. 13,"[57] admitting that the $300,000 that the government provided for this work was not enough. *See generally*, ECCI, 2025 WL 1357784 (regarding admissions; collecting cases). Despite that admission, the government only questions, without offering any alternative, the additional amount that ECCI seeks for the work that the government unilaterally directed: $146,963 for materials, shipping, and labor, plus markups for a total of $170,472.[58] Again, it is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation. *Bluebonnet*, 266 F.3d at 1355. ECCI provides a breakdown of the additional amount it seeks in a detailed spreadsheet created by Mr. Hayward, whose presentation we credit on this point;[59] we find that spreadsheet adequate to the task. However, when we apply the markups that ECCI has identified (5.4% G&A and 10% profit),[60] we arrive at $170,388 (rounded). For these reasons, we determine that ECCI is entitled to recover $170,388 for server cabinets and relay racks.

*5. UL Listed Material*

ECCI requests $207,893 for what it says was a government-directive constructive change to the contract that *only* UL (Underwriters Laboratories, Inc.) [61] Listed communications materials be provided, as opposed to requiring that *only specific* communications materials be UL Listed.[62] However, ECCI fails to allege that—much less point to evidence that—the alleged directive came from a contracting officer; rather, ECCI again points the finger at Mr. Hopkins.[63] Because ECCI fails to point to a contracting officer directive that only UL Listed materials be provided, ECCI's request for additional compensation for this item is denied.

---

[57] Gov't br. at 96-97; app. br. at 69 ¶ 183; R4, tab 26.

[58] Gov't br. at 97; *see* app. br. at 69 ¶ 186.

[59] App. supp. R4, tab 321 (Racks): "Cabinet Unilateral and Relay Rack Directed Changes"; tr. 2/56-57; ex. 1 at 25 ¶ 123.

[60] App. br. at 66 ¶ 165.

[61] R4, tab 5 at 442-43 § 9.3.1.

[62] *See* app. br. at 69-72 ¶¶ 187-95.

[63] *Id.* at 70 ¶¶ 192-93; app. reply at 71.

*6. LeGrand Raised Floor Outlet Boxes*

ECCI requests $62,325 associated with the installation of LeGrand raised floor outlet boxes that ECCI says were needed to accommodate a government directive that ECCI revise its electrical distribution system to meet British Standards (BS).[64] Specifically, ECCI says that Mr. Hopkins "directed that ECCI provide LeGrand Evolution Series raised floor boxes."[65] Again, Mr. Hopkins was not the contracting officer, so no direction by him could change the contract.

In addition, the government points to Modification No. 14, a May 2013 bilateral Modification that provides:

> Contractor shall provide all material, supplies, equipment, design and labor necessary to construct and or install the electrical system components associated with contract change MN032 in accordance with British Standard 7671.[66]

The government points also to the following "closing statement" set forth in Modification No. 14, which statement the government says bars ECCI's claim for additional compensation for having to install LeGrand floor boxes to meet the British Standard:

> It is understood and agreed that pursuant to the above, the contract time is not affected, and the contract price is increased a stated above, which reflects all credits due the Government and all debits due the Contractor. *It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated.*[67]

We agree that the second sentence of the closing statement applies to ECCI's LeGrand floor boxes claim, in that any cost arising from having to install those floor boxes is, in the parlance of the statement, "attributable for the change ordered" by

---

[64] App. br. at 72-74.
[65] *Id.* at 72 ¶ 197; *see also id.* at 17 ¶ 72 (citing app. supp. R4, tab 69), 42.
[66] R4, tab 28 at 2; gov't br. at 91 ¶ 161.
[67] R4, tab 28 at 4 (emphasis added); gov't br. at 91 ¶ 161.

Modification No. 14; such change being that ECCI "provide all material, supplies, equipment, design and labor necessary to construct or install the electrical system components associated with contract change MN032 in accordance with British Standard 7671." Certainly, that closing statement does not expressly exempt LeGrand raised floor boxes from the scope of the modification, nor does Modification No. 14 anywhere else reserve LeGrand raised floor boxes from its scope. *See United States v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907) ("If parties intend to leave some things open and unsettled, their intent to do so should be made manifest."). Furthermore, we see no ambiguity in the language of Modification No. 14 that would warrant our accepting ECCI's implied invitation to consider parol evidence to interpret the scope of the modification.[68] *See Avant Assessment, LLC*, ASBCA No. 58867, 15-1 BCA ¶ 36,137 at 176,384. For all these reasons, this component of the appeal is denied.

*7. Non-Metallic Raceways*

ECCI requests $71,788 for what it says was the government's directive that ECCI use "non-metallic raceway" for cable routing in certain applications, instead of the metallic raceway or cable tray that ECCI says it had planned to use.[69] ECCI says that the contract did not require the use of non-metallic raceways, but that Mr. Hopkins issued the challenged directive.[70] However, nowhere does ECCI allege that a contracting officer directed the alleged change;[71] consequently, ECCI fails to point to a person with authority to have made the alleged contract change. *See BGT Holdings*, 984 F.3d at 1012-13*; Conquistador Dorado*, 24-1 BCA ¶ 38,486 at 187,070-71; *Derian*, 23-1 BCA ¶ 38,425 at 186,757. Accordingly, ECCI's request for additional compensation for non-metallic raceways is denied.

*8. Flexible Metal Conduit, and Additional Conduit*

ECCI requests $178,166 for what it says was the government's directive that the flexible metal conduit that ECCI installed be "UL Listed," and that ECCI provide "a spare empty conduit for the raised floor outlets."[72] In its opening brief, ECCI points only to Mr. Hopkins as the source of this alleged directive, rather than a contracting officer.[73] In its reply brief, ECCI says that the ACO "directed the spare and extra conduits be provided,"[74] but ECCI having raised that issue for the first time in its reply

---

[68] App. br. at 73 (citing app. supp. R4, tabs 193, 288, 290).

[69] App. br. at 75-76.

[70] *Id.* at 75 ¶ 210.

[71] *See id.* at 74-76; app. reply at 69-71.

[72] App. br. at 77 ¶¶ 224, 227.

[73] *Id.* at 77-78.

[74] App. reply at 72.

brief, that issue is waived. *Brooks Range Contract Servs., Inc. v. United States*, 101 Fed. Cl. 699, 708 (2011) ("[A] party waives issues not raised in its opening brief.").

ECCI having failed to demonstrate that a person with authority directed the alleged contract changes, its request for additional compensation for providing (1) flexible metal conduit that was UL Listed (as opposed to non-UL Listed), and (2) spare conduit, is denied. *See BGT Holdings*, 984 F.3d at 1012-13*; Conquistador Dorado*, 24-1 BCA ¶ 38,486 at 187,070-71; *Derian*, 23-1 BCA ¶ 38,425 at 186,757.

9. *Trunk and Splice Outside Plant Configuration, and 25% Spare Fibers*

ECCI seeks $75,026 for having to configure cables in a "trunk and splice" outside plant (OSP) configuration, as opposed to the "homerun" configuration that ECCI says its designer chose,[75] and for having to provide "25% spare fibers in the trunk line."[76] Regarding the "trunk and splice" versus "homerun" configuration, we understand from the parties that the terms "trunk and splice" and "loop-through splicing" are synonymous.[77] As noted above regarding dedicated electrical panels, the contract incorporates the I3A.[78] Paragraph 3.15.4.7(c) of the I3A, "Splices and Power Budget" provides:

> Loop-through splicing shall be used *in lieu of homeruns*/dedicated cables to the serving location.[79]

And paragraph 3.7.8.4 of the I3A, "Fabric-mesh Innerduct," provides:

> Fiber optic cables *shall not be "home run"* from buildings to serving nodes because of the increased modularity of fabric type innerducts.[80]

ECCI does not address ¶¶ 3.7.8.4 and 3.15.4.7(c). We determine that ¶¶ 3.7.8.4 and 3.15.4.7(c) defeat ECCI's claim for additional compensation for having to configure OSP cables in a trunk and splice configuration.

---

[75] App. br. at 79-80 ¶¶ 239, 242, 244.

[76] *Id*. at 79 ¶ 243.

[77] App. reply at 75-76; gov't br., app'x 16 at 74.

[78] R4, tab 5 at 450.

[79] R4, tab 826 at 75 (emphasis added).

[80] *Id.* at 53 (emphasis added).

Regarding spare fibers, the government points to § 10.17 of the contract, "Outside Plant Cable Installation,"[81] which provides:

> The cable system shall have a factor of 25% spare built in
> additions of service without installing addition [sic]
> physical Outside plant cable.[82]

ECCI addresses § 10.17, but not its reference to the "25% spare" factor.[83] We determine that § 10.17 defeats ECCI's claim for additional compensation for having to provide "25% spare fibers in the trunk line."

### 10. Spare Capacity and Wire Managers for Relay Racks

ECCI requests $29,084, stating that "[t]he direction to provide additional spare rack space and wire managers constitutes a constructive change causing direct costs for redesigning the racks and installing additional materials," referencing only alleged direction from Mr. Hopkins.[84] The government says that "ECCI's post-hearing brief claims costs due to direction to provide additional spare rack and wire managers, but"—presumably referring to ECCI's May 2, 2014 claim to the contracting officer[85]— "the claim makes no such demand regarding spare rack."[86] The government further states that "[i]t is not clear the amounts attributable to each claim and it would be speculation to assign any amount for wire managers." [87] ECCI replies that:

> [The government] incorrectly argues that ECCI's post
> hearing brief claims costs due to providing spare racks, but
> the claim does not. (Citation omitted). Both the claim and
> ECCI's revised cost calculations include costs required to
> revise its design to produce the [text illegible] within the
> racks that were already in the design.[88]

---

[81] Gov't br. at 94 ¶ 168.

[82] R4, tab 5 at 464 ¶ 10.17; gov't br., app'x 1 at 39).

[83] App. br. at 79 ¶ 238.

[84] App. br. at 80-81 ¶¶ 245-51.

[85] R4, tab 75.

[86] Gov't br. at 104.

[87] *Id.*

[88] App. reply at 84. The illegible text referenced in the quotation above is one of many instances in which, in ECCI's reply brief, text appears compressed, compromising legibility or making text illegible altogether. Despite the Board's having ordered ECCI to refile its reply brief to correct that infirmity, ECCI refiled what is evidently the same, typographically problematic brief.

We see in the May 2, 2014 claim to the contracting officer that ECCI says that, in a reference to Mr. Hopkins, "[t]he Communications systems design reviewer directed ECCI to . . . [p]rovide additional relay racks to accommodate additional patch panels required because of the additional cables, *as well as additional spare rack capacity*---not required by the contract'" that statement, however, is in reference to ECCI's challenge to what ECCI says is "[t]he unwarranted level and type of comments subsequent to the design review comments period."[89] We see no stand-alone claim presented to the contracting officer for additional spare rack capacity, and conclude that we lack jurisdiction to entertain such a claim; consequently, we dismiss that claim for lack of jurisdiction. *See* 41 U.S.C. § 7103(a).

On the other hand, the claim demands $27,093.56 for wire managers.[90] However, ECCI relies upon the communications of Mr. Hopkins for its government-direction claim; that reliance is not enough, because, again, Mr. Hopkins was not a contracting officer. Consequently, we deny on its merits ECCI's claim for additional compensation for wire managers.

*11. Uninterruptible Power Supply (UPS)*

ECCI seeks $72,187 ($83,729 with markups) for having to provide a 225 KVA UPS unit, instead of a 120 KVA UPS unit (or the 200 KVA UPS unit that ECCI alleges the ACO directed be used), later than it would have otherwise.[91] In March 2011, the parties signed Modification No. A00002 to the contract, making certain changes to the work.[92] In a July 2011 letter to ECCI, the ACO took the opportunity to address "unresolved critical design issues," including that, as the ACO put it, "[t]he UPS requirement was deleted from the contract in modification number A00002."[93] In the sentence following the reference to the USP requirement, the ACO directed ECCI "to proceed with design and construction in accordance with the findings above."[94] Although, as the government points out,[95] Modification No. A00002 does not reference the USP requirement,[96] we find that in the July 2011 letter, the ACO lifted the requirement to provide a UPS system.

Nearly two years later, in May 2013, the contracting officer resurrected the UPS issue, and, in response to ECCI's proposal to "base the design on a demand load of

---

[89] R4, tab 75 at 12 (emphasis added).
[90] *Id.* at 32.
[91] App. br. at 82-83 ¶¶ 255, 256, 258, 262.
[92] R4, tab 9 at 1.
[93] R4, tab 141 at 1-2.
[94] *Id.* at 2.
[95] Gov't br. at 105 ¶ 216.
[96] R4, tab 9.

120 KVA,"[97] the contracting officer directed that ECCI provide a UPS system "sized for a 200 KVA demand load (168 KVA x 1.20).[98]  That is, the government having changed the contract in July 2011, to eliminate the UPS requirement, the government changed the contract again, in May 5, 2013; this time to require a 200 KVA UPS.

The contracting officer also left open the possibility of paying for expedited delivery costs:

> It is requested that we receive a proposed procurement/delivery schedule as soon as possible from ECCI to include option for expedited delivery (if needed) to meet the proposed turnover date for the Communications Building of 21 July 2013.  If there is an option for proposed expedited delivery costs, the Government will address as soon as possible to include a potential modification to the contract if warranted.[99]

In response, ECCI agreed to provide a 200 KVA UPS system, and warned that "the additional cost of the larger system, *not including expedited delivery or delay costs*, will exceed $100,000."[100]  ECCI claims to have provided a 225 KVA unit at an apparent increased cost of $83,729.[101]  However, as the government points out, ECCI's claim indicates that it purchased a 200 KVA unit that was "upgradable to 225 KVA."[102]

At least at some point after contracting, ECCI understood that, pursuant to section 9.1.1 of the contract, it would have to design and construct a UPS.[103]  And it appears that at some point, ECCI understood that the system would consist of government-furnished equipment, and that the UPS system would consist of a 200 KVA unit.  Indeed, Sheet Reference No. P3-E-601, dated November 18, 2011, and submitted by ECCI's designer, Atkins Global, includes the notation "200KVA" as part of a "UPS Room," with "Equipment by Gov't."[104]  ECCI does not claim here that it bid the contract understanding that the UPS system would be government-furnished, and we find that the concept of government-furnished equipment post-dates the

---

[97] R4, tab 485 at 1.
[98] R4, tab 489.
[99] *Id.*
[100] R4, tab 495 at 1 (emphasis added).
[101] App. br. at 82-83 ¶¶ 256, 262.
[102] Gov't br. at 106 ¶ 221; R4, tab 75 at 113.
[103] R4, tab 5 at 441.
[104] Gov't br., app'x 8 at 48-49.

parties' entering the contract. However, based upon Sheet Reference No. P3-E-601, we find that ECCI understood at least as late as November 2011, that it would be installing a 200 KVA unit. Consequently, the issue here is not that ECCI is entitled to compensation for having provided a 200 KVA system, but whether ECCI is entitled to the difference between the cost of providing a 200 KVA system after May 2013, when the government reinstated the contract requirement to provide a UPS system that in 2011, it had eliminated. A spreadsheet in ECCI's claim provides a credible basis for such compensation: $5,946 for airfreight, and $5,200 for "late rework,"[105] for a total of $11,146, which, marked up to $12,922 (rounded), we award for this item.

*12. United Laboratories (UL) Listed HVAC Equipment With R-410 Refrigerant*

ECCI seeks $861,998 for an alleged change to the contract to require ECCI to provide UL Listed HVAC equipment and meet an accelerated completion date.[106] ECCI says:

> On June 18, 2012, [the government] disapproved ECCI's May 29, 2012 construction submittal proposing additional CE marked HVAC equipment that used R22 refrigerant; ECCI was directed to provide UL listed equipment with R410 refrigerant.[107]

ECCI also says:

> On November 20, 2012, [the government] directed ECCI to provide UL listed HVAC equipment, with R-410 refrigerant. ECCI promptly submitted UL listed equipment with R410 refrigerant, but did not receive review comments from [the government] for 55 days.[108]

Specifically, ECCI says that "[Mr.] Hopkins continuously directed ECCI to provide only UL communications materials."[109] Of course, Mr. Hopkins was not the contracting officer, and none of the material that ECCI cites is a statement of a contracting officer. The alleged November 20, 2012 "direction" by the government referenced above is apparently an interaction between the government and ECCI

---

[105] R4, tab 75 at 113.

[106] App. br. at 87 ¶ 289.

[107] *Id.* at 85 ¶ 280 (citing app. supp. R4, tabs 581, 594; ex. 1 at 35 ¶¶ 193, 195).

[108] *Id.* at 86 ¶ 285 (citing app. supp. R4, tab 143 at 2, R4, tab 381; exs. 1 at 35 ¶¶ 198, 26).

[109] *Id.* at 70 ¶ 193.

20

during a meeting held on that date, during which, according to notes of the meeting prepared by ECCI, the following happened:

> HVAC Specifications and Equipment Submittals – MED / Marmal RO has directed ECCI provide UL equipment and R410 refrigerant. ECCI is proceeding and will submit an REA for the additional cost and time impact.[110]

ECCI makes no effort to identify who "MED / Marmal RO" is, much less does ECCI represent that such person is a contracting officer. The Board will not scour the record for ECCI's evidence, or do ECCI's work for it. *See ESCgov, Inc.*, ASBCA No. 58852, 17-1 BCA ¶ 36,772 at 179,189; *Highland al Hujaz*, ASBCA No. 58243, 16-1 BCA ¶ 26,336 at 177,169-70. ECCI has failed to demonstrate that the government, in the person of the contracting officer, directed ECCI to use R-410 refrigerant. Consequently, we deny ECCI's request for compensation for having used R-410 refrigerant.

### 13. Additional Local Operator Consoles (LOCs)

ECCI requests $16,806 for what it says was the government's requirement that ECCI install three additional LOCs in the TOC.[111] Citing exhibit 1 at 40 ¶ 231, ECCI states that the government "directed ECCI to install three additional LOCs in the TOC, based upon an Army requirement for minimum travel distance needed to reach a LOC."[112] That paragraph states, in its entirety:

> The Government argues that ECCI's design was deficient because the UFC have criteria for an "Army" project regarding the maximum distance [an] occupant can travel to an LOC and that criteria dictated an LOC in each of the four TOC rooms.[113]

We find no evidence of government direction in that paragraph, and will not scour the record for such evidence. *See Parsons Evergreene, LLC v. Sec'y Air Force*, 968 F.3d 1359, 1368; *McCotter Motors, Inc.*, ASBCA Nos. 30498, 30997, 86-2 BCA ¶ 18,784 at 94,647 ("The days of simply alleging every conceivable theory and leaving it up to the Board to search for facts and law to support the theories are over."). Accordingly, ECCI's request for $16,806 for additional LOCs is denied.

---

[110] App. supp. R4, tab 143 at 2 (boxed in red in the original).
[111] App. br. at 87-88.
[112] *Id.* at 88 ¶ 295.
[113] Ex. 1 at 40 ¶ 231.

## 14. Vehicle Maintenance Facility (VMF)

ECCI requests $3,514 for what it says was the government's requirement that ECCI reduce the size of the VMF.[114] The ACO "directed [ECCI] to develop a process to reduce the gross area for the Vehicle Maintenance Shop Building to a maximum gross area of 462 sm."[115] That was, apparently, a reduction in size, because ECCI says that "[r]educing the size of the VMF caused ECCI $3,031 in additional direct costs, $3,514 with G&A and Profit."[116] However, ECCI does not explain how reducing the size of the VMF increased its costs, which, as the government implies, is, at least apparently, counterintuitive.[117] We find more persuasive the government's position upon this item, and deny ECCI's request for $3,514 for the reduction of the size of the VMF.

## 15. 144 Port Fiber Optic Combination Units (FOCUS)

ECCI seeks $54,992 for what ECCI characterizes as a directed change by Mr. Hopkins to install 144 FOCUs.[118] ECCI also says that in *ECC Int'l Constructors, LLC*, ASBCA No. 59138 *et al.*, 19-1 BCA ¶ 37,281 at 181,388, we held that "the directive to install 144 FOCUs was a change."[119] We did no such thing. Rather, we held that:

> The contract provides that:
>
> The fiber optic cables shall be terminated in floor mounted, four post relay rack combination units that will allow splicing and patching within the same enclosure. The enclosures shall be sized to contain a minimum of 48 fibers and a maximum of 144 fibers.
>
> The parties disagree on whether the provision requires each "enclosure" to be able to contain 144 fibers. The plain unambiguous language of the provision requires that "enclosures," in general, be sized to contain at least 48 fibers but no more than 144 fibers; *it does not require that each enclosure be sized to contain 144 fibers.*

---

[114] App. br. at 89.

[115] R4, tab 183.

[116] App. br. at 89 ¶ 308.

[117] *See* gov't br. at 120 ¶ 259.

[118] App. br. at 90.

[119] *Id.*

*ECCI*, 19-1 BCA ¶ 37,281 at 181,388 (citations omitted; emphasis added).  Now the government says that no contracting officer directed ECCI "to size every FOCU to 144 fibers."[120]  To this, ECCI says that "ECCI was given direction by [Mr.] Hopkins in a January 12, 2012 conference call that all FOCUs were to be 144 port units."[121]  But Mr. Hopkins was a design reviewer,[122] not a contracting officer.  ECCI fails to point to a person with authority who made the alleged contract change.  *See BGT Holdings*, 984 F.3d at 1012-13*; Conquistador Dorado*, 24-1 BCA ¶ 38,486 at 187,070-71; *Derian*, 23-1 BCA ¶ 38,425 at 186,757; *States Roofing Corp.*, ASBCA No. 55500, 09-1 BCA ¶ 34,036 at 168,348 ("ROICC's [(Resident Officer in Charge of Construction)] authority to administer the contract did not empower Mr. Haste, a member of the ROICC's senior management, with either express or implied authority to modify the contract with a compensable change requiring SRC to provide a full-time safety person."); *relying upon Winter v. Cath-Dr/Balti Joint Venture*, 497 F.3d 1339 (Fed. Cir. 2007).  Accordingly, ECCI's request for compensation for the installation of 144 FOCU Units is denied.

*16.  Additional Ladder Rack and Overhead Cable Tray*

The government says that ECCI has abandoned a claim for at least $36,404.32 allegedly owed for "additional ladder racks in communications rooms," and "overhead cable tray in the TOC."[123]  The government takes this position because, it says, ECCI has not addressed that claim in its post-hearing briefs, and pointing out that in March 2019, in *ECCI*, 19-1 BCA ¶ 37,281 at 181,387, we held that the contract required the installation of a cable ladder rack around the walls of communications and server rooms.[124]  ECCI does not respond to the argument that it has abandoned that claim. Although we see in ECCI's initial post-hearing brief one reference to ladder racks, and several references to cable tray,[125] those references appear to relate to other claims, rather than a claim for a least $36,404,32 allegedly owed for "additional ladder rack around the perimeter of the communications rooms," and "overhead cable tray on the TROC due to additional outlets."  We find any such claim abandoned.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)

---

[120] Gov't br. at 101.

[121] App. reply at 81(citing R4, tab 755 at 99, comment 4329792; tab 1165 at 12 ¶ "FOCU 1").

[122] *See* app. br. at 5 ¶ 24; gov't br. at 48.

[123] Gov't br. at 119.

[124] *Id.*

[125] *E.g.*, app. br. at 12 ¶ 61 (ladder rack and cable tray in context of design review), 74 ¶ 205 (cable tray in context of non-metallic raceways); 92 (listing alleged contract changes including "direction to install non-metallic raceways from the wall outlets to cable trays for the secret and above secret systems").

## CONCLUSION

We have considered the parties' other arguments and find them unnecessary to address. We dismiss for lack of jurisdiction ECCI's claims for additional compensation for additional spare rack capacity. We sustain the appeal in the amount of $429,411, consisting of (1) $246,101 for the cost of responding to the government's review of the 100% communications design; (2) $170,388 for server cabinets and relay racks, and (3) $12,922 for the uninterruptable (UPS) system, plus interest in accordance with 41 U.S.C. § 7109, from May 2, 2014, the date that the contracting officer received ECCI's claim, until the date of payment.

Otherwise, the appeal is denied.

Dated: July 29, 2025

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

24

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59643, Appeal of ECC International Constructors, LLC, rendered in conformance with the Board's Charter.

Dated:  July 29, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals